1

2

3

4

5

6

7

8           IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DEBRA DUANN GIBSON,

11          Plaintiff,                    No. 2:11-cv-3330-KJN

12      v.

13   MICHAEL J. ASTRUE,
     Commissioner of Social Security,
14
            Defendant.                    <u>ORDER</u>
15   _____/

16          Plaintiff seeks judicial review of a final decision of the Commissioner of Social

17   Security ("Commissioner") partially granting and partially denying plaintiff's applications for

18   Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

19   and XVI, respectively, of the Social Security Act ("Act").[1]  In her motion for summary judgment,

20   plaintiff principally contends that the Commissioner erred by finding that plaintiff's disability,

21   which commenced on March 17, 2006, ceased as of October 2, 2008.  (Dkt. No. 16.)  The

22   Commissioner filed an opposition to plaintiff's motion and a cross-motion for summary

23   judgment.  (Dkt. No. 21.)  For the reasons that follow, the court denies plaintiff's motion for

24   _____

25        [1]  This case was referred to the undersigned pursuant to E.D. Cal. L.R. 302(c)(15) and
     28 U.S.C. § 636(c), and both parties voluntarily consented to proceed before a United States
26   Magistrate Judge.  (Dkt. Nos. 7, 9.)

                                    1

summary judgment and grants the Commissioner's cross-motion for summary judgment.

I.       BACKGROUND

Plaintiff was born on March 31, 1959, has an eleventh grade education, and previously worked as a bartender, waitress, cashier, cashier supervisor, courier, home health aide, and office manager.[2]  (Administrative Transcript ("AT") 358, 360-68, 401-02.)  In August 2006, plaintiff applied for DIB and SSI,[3] alleging that she was unable to work as of March 17, 2006, primarily due to left shoulder, arm, back, and neck pain; an inability or limited ability to use her

---

[2]  Because the parties are familiar with the factual background of this case, including plaintiff's medical history, the court does not exhaustively relate those facts in this order.  The facts related to plaintiff's impairments and medical history will be addressed insofar as they are relevant to the issues presented by the parties' respective motions.

[3]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program.  42 U.S.C. §§ 401 et seq.  Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. §§ 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs initial eligibility for DIB and SSI.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

1   left arm and left hand; diabetes; asthma; and allergies.  (AT 24, 55.)  Plaintiff's claim was denied

2   initially and upon reconsideration, and she thereafter requested a hearing before an administrative

3   law judge ("ALJ"), which took place on March 19, 2009.  (AT 48, 355.)

4          In a decision dated August 19, 2009, the ALJ determined that plaintiff had been

5   under a disability, as defined in the Act, from March 17, 2006, through October 1, 2008, but that

6   plaintiff's disability had ended on October 2, 2008.  (AT 24-36.)  The ALJ's decision became the

7   final decision of the Commissioner when the Appeals Council denied plaintiff's request for

8   review on May 27, 2011.  (AT 11-14.)  After obtaining extensions of time from the Appeals

9   Council, plaintiff commenced this action in federal district court on December 15, 2011, to

10  obtain judicial review of the Commissioner's final decision.  (Dkt. No. 1.)

11  II.    ISSUES PRESENTED

12         Plaintiff raised the following issues: (1) whether the ALJ improperly rejected the

13  opinion of plaintiff's treating physician Dr. Ghada Abdelwahed; (2) whether the ALJ improperly

14  discounted plaintiff's testimony concerning her symptoms and functional limitations; (3) whether

15  the ALJ improperly formulated hypotheticals for the vocational expert's consideration; and (4)

16  whether the ALJ erroneously determined that plaintiff had not changed age categories during the

17  relevant period.

18  III.   LEGAL STANDARD

19         Where the issue of continued disability or medical improvement is concerned, "a

20  presumption of continuing disability arises" in the claimant's favor once that claimant has been

21  found to be disabled.  Bellamy v. Sec'y of Health & Human Servs., 755 F.2d 1380, 1381 (9th

22  Cir. 1985) (citing Murray v. Heckler, 722 F.2d 499, 500 (9th Cir. 1983)).  The Commissioner has

23  the "burden of producing evidence sufficient to rebut [the] presumption of continuing disability."

24  Id.; see also Murray, 722 F.2d at 500 ("The Secretary . . . has the burden to come forward with

25  evidence of improvement").  However, a reviewing court will not set aside a decision to

26  terminate benefits unless the determination is based on legal error or is not supported by

3

1    substantial evidence in the record as a whole.[4]  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir.

2    1984); accord Bellamy, 755 F.2d at 1381; Murray, 722 F.2d at 500.

3            A claimant's benefits may be terminated where the Commissioner produces

4    substantial evidence that: "(A) there has been any medical improvement in the individual's

5    impairment or combination of impairments (other than medical improvement which is not related

6    to the individual's ability to work), and (B) the individual is now able to engage in substantial

7    gainful activity."  42 U.S.C. § 423(f)(1).  The applicable regulation defines "medical

8    improvement" as follows:

9            Medical improvement is any decrease in the medical severity of your
             impairment(s) which was present at the time of the most recent favorable
10           medical decision that you were disabled or continued to be disabled.  A
             determination that there has been a decrease in medical severity must be
11           based on changes (improvement) in the symptoms, signs and/or laboratory
             findings associated with your impairment(s). . . .
12

13   20 C.F.R. § 404.1594(b)(1).

14           The Commissioner evaluates whether a claimant continues to be entitled to DIB

15   under an eight-part analytical framework, which consists of the following steps:

16           (1) Are you engaging in substantial gainful activity? If you are (and any
             applicable trial work period has been completed), we will find disability to
17           have ended (see paragraph (d)(5) of this section).

18           (2) If you are not, do you have an impairment or combination of
             impairments which meets or equals the severity of an impairment listed in
19           appendix 1 of this subpart? If you do, your disability will be found to
             continue.
20

21   _____

22          [4] "Substantial evidence means more than a mere scintilla but less than a preponderance;
     it is such relevant evidence as a reasonable mind might accept as adequate to support a
23   conclusion."  Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222 (9th Cir. 2009)
     (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)); accord Valentine v. Comm'r
24   of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009).  "Where the evidence as a whole can
     support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's."
25   Bray, 554 F.3d at 1222 (citing Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007)); see also
     Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("'Where evidence is
26   susceptible to more than one rational interpretation,' the ALJ's decision should be upheld")
     (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).

(3) If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step (4). If there has been no decrease in medical severity, there has been no medical improvement. (See step (5).)

(4) If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step (5). If medical improvement is related to your ability to do work, see step (6).

(5) If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step (6). If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.

(6) If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 404.1521). This determination will consider all your current impairments and the impact of the combination of those impairments on your ability to function. If the residual functional capacity assessment in step (4) above shows significant limitation of your ability to do basic work activities, see step (7). When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

(7) If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 404.1560. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.

(8) If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment made under paragraph (f)(7) of this section and your age, education, and past work experience....If you can, we will find that your disability has ended.  If you cannot, we will find that your disability continues.

1    20 C.F.R. § 404.1594(f)(1)-(8).[5]

2    IV.    DISCUSSION

3          A.    Summary of the ALJ's Findings

4          As noted above, the ALJ determined that plaintiff was disabled from her alleged

5    onset date of March 17, 2006, through October 1, 2008.  (AT 33.)  For purposes of this closed

6    period, the ALJ evaluated plaintiff's initial entitlement to DIB and SSI pursuant to the

7    Commissioner's standard five-step analytical framework.

8          As an initial matter, the ALJ found that plaintiff remained insured for purposes of

9    DIB as of March 17, 2006, her alleged disability onset date.  (AT 28.)  At the first step, the ALJ

10   concluded that plaintiff had not engaged in substantial gainful activity since her alleged disability

11   onset date.  (Id.)  At step two, the ALJ determined that plaintiff had the following severe

12   impairments: obesity, diabetes mellitus 2, status post motor vehicle accident with multiple

13   surgeries and upper extremity fracture, and depression.  (Id.)  However, at step three, the ALJ

14   determined that plaintiff did not have an impairment or combination of impairments that met or

15   medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)

16         Before proceeding to step four, the ALJ assessed plaintiff's residual functional

17   capacity ("RFC") for the period of March 17, 2006, through October 1, 2008 as follows:

18           After careful consideration of the entire record, the undersigned
             finds that, from March 17, 2006 through October 1, 2008, the
19           claimant had the residual functional capacity to perform light work
             as defined in 20 CFR 404.1567(b) and 416.967(b) as follows:
20           lift/push/pull 20 pounds occasionally and 10 pounds frequently;
             walk/stand frequently; sit/stoop/bend occasionally;
21           attention/concentration was slightly limited; understanding/
             memory was moderately limited; overhead and side reaching with
22           her left non-dominant side was moderately limited (less than 3
             hours/shift); moderate limitation in ability to do simple routine
23           repetitive tasks (pace and persistence); limited environmentally

24   ────────────────
        [5] The seven-step process used to evaluate continued entitlement to SSI is virtually
25   identical to the eight-step process used to evaluate continued entitlement to DIB, except that the
     first step in the DIB evaluation framework (regarding performance of substantial gainful activity)
26   is omitted in the SSI evaluation framework.  See 20 C.F.R. § 416.994(b)(5)(i)-(vii).

> because of asthma requiring frequent medication more than 4 times
> a day; would only be able to have limited contact with the public (6
> hours or less per shift); would require close supervision (2 hours or
> more/shift); and had moderate-severe pain (frequent medication).

(AT 28.)

At step four, based on vocational expert testimony, the ALJ found that plaintiff was unable to perform her past relevant work from March 17, 2006, through October 1, 2008. (AT 32.)  The ALJ then proceeded to step five and found, in reliance on vocational expert testimony, that there were no jobs that existed in significant numbers in the national economy that plaintiff could have performed from March 17, 2006, through October 1, 2008, based on plaintiff's age, education, work experience, and RFC.  (Id.)  Accordingly, the ALJ concluded that plaintiff had been under a disability, as defined in the Act, from March 17, 2006, through October 1, 2008.  (AT 33.)

Next, in reaching a conclusion that plaintiff's disability had ceased as of October 2, 2008, the ALJ employed the eight-step analytical framework for evaluating continued entitlement to DIB.[6]  At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since March 17, 2006.  (AT 28.)  At step two, the ALJ found that, as of October 2, 2008, plaintiff did not have an impairment or combination of impairments that meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AT 33.)

At step three, the ALJ found that medical improvement had occurred as of October 2, 2008.  (AT 33.)  The ALJ assessed plaintiff's RFC as of October 2, 2008 as follows:

> After careful consideration of the entire record, the undersigned
> finds that, beginning on October 2, 2008, the claimant has had the
> residual functional capacity to perform light work as defined in 20
> CFR 404.1567(b) and 416.967(b) as follows: lift/push/pull 20
> pounds occasionally and 10 pounds frequently; walk/stand

---

[6] As noted above, the seven-step analytical framework for continued entitlement to SSI is virtually identical, but merely omits the first step of the eight-step analytical framework for DIB. For convenience, and because the findings largely overlap, the court outlines only the ALJ's findings with respect to the eight-step analytical framework for DIB.

frequently; sit/stoop/bend occasionally; attention/concentration was
slightly limited; understanding/memory was slightly limited;
overhead and side reaching with her left non-dominant side was
slightly limited (less than 6 hours per shift); slight limitation in
ability to do simple routine repetitive tasks (pace and persistence);
limited environmentally because of asthma requiring occasional
medication with occasional being three times a day or less; would
only be able to have limited contact with the public (6 hours or less
per shift); would require occasional supervision; and had slight-
moderate pain (occasional medication).

(AT 34.)  After comparing this RFC with plaintiff's more limited RFC for March 17, 2006,

through October 1, 2008, the ALJ determined at step four that the medical improvement that had

occurred was related to plaintiff's ability to work.  (Id.)  In light of this finding, the ALJ bypassed

step five and found at step six that plaintiff's combination of impairments was severe.  (AT 35.)[7]

At step seven, based on vocational expert testimony, the ALJ determined that

plaintiff could perform past relevant work as a courier or office manager as of October 2, 2008.

(AT 35.)  In the alternative, the ALJ proceeded to step eight and found, in reliance on vocational

expert testimony, that plaintiff could also perform other jobs that existed in significant numbers

in the economy, as of October 2, 2008, based on plaintiff's age, education, work experience, and

RFC.  (Id.)  In particular, the ALJ found that plaintiff could perform the following representative

occupations: office helper (with 16,000 jobs in California); mail clerk (with 10,000 jobs in

California); and fast food worker (with 26,250 jobs in California).  (Id.)  In light of these

findings, the ALJ concluded that plaintiff's disability had ceased as of October 2, 2008.  (Id.)

////

////

////

////

---

[7] The ALJ did not expressly make a finding of severity at step six.  Nevertheless, this
appears to have been a technical oversight, because the ALJ implicitly found plaintiff's
combination of impairments to be severe by proceeding to step seven.  See 20 C.F.R. §
404.1594(f)(6).

B.    Plaintiff's Substantive Challenges to the Commissioner's Determinations

      1.    Whether the ALJ improperly rejected the opinion of plaintiff's treating physician, Dr. Ghada Abdelwahed

Plaintiff contends that, in determining that plaintiff's disability had ceased as of October 2, 2008, the ALJ improperly rejected the March 6, 2009 opinion of plaintiff's treating physician, Dr. Ghada Abdelwahed.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons.  Lester, 81 F.3d at 830-31.  In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons.  Lester, 81 F.3d at 830.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund, 253 F.3d at 1157,[8] except that the ALJ

---

[8]  The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization.  20 C.F.R. § 404.1527.

1  in any event need not give it any weight if it is conclusory and supported by minimal clinical

2  findings. Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory,

3  minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751. The opinion of a

4  non-examining professional, without other evidence, is insufficient to reject the opinion of a

5  treating or examining professional. Lester, 81 F.3d at 831.

6          In this case, plaintiff was involved in a serious, single-vehicle rollover car

7  accident on March 16, 2006, causing numerous fractures, internal injuries, and an open injury to

8  her left arm. (AT 114, 188.) Plaintiff had a positive toxic screen for alcohol and amphetamines,

9  and in addition to her accident-related injuries was noted to have asthma, a history of smoking,

10  obesity, diabetes mellitus type 2, and depression. (Id.) On May 4, 2006, after extensive

11  treatment by consultants from orthopedics, internal medicine, and pulmonary medicine, plaintiff

12  was discharged as fully ambulatory, tolerating her diet well, on physical therapy, "quite

13  comfortable with no pain," but with still limited mobility in her left shoulder. (AT 112-198.)

14          On November 1, 2006, plaintiff was examined by consultative examiner and

15  board certified surgeon Dr. Phillip Seu. (AT 199-203.) Plaintiff reported that she was making

16  slow progress and felt stronger, but that the main problem was use of her left arm, she could not

17  completely close her left hand, and had trouble doing things that required the use of both hands,

18  such as sweeping. (AT 199-200.) Plaintiff also stated that she had asthma, triggered by walking

19  or talking a lot, as well as anxiety, but that she had not had any recent ER visits or

20  hospitalizations for asthma. (Id.) During his physical examination, Dr. Seu noted that plaintiff

21  had a fairly normal gait and had no difficulty standing, walking, sitting, or getting on and off the

22  exam table, but that she did not use her left arm much and appeared to be in physical discomfort

23  from her left arm. (AT 200.) Plaintiff's chest and lungs were clear, and she was noted to be

24  obese. (AT 201.) Dr. Seu observed that plaintiff had numerous healed surgical incisions, a

25  siliceous skin graft over her left forearm with some evidence of tissue loss, and atrophy of her

26  left forearm and hand muscles. (AT 202.) He diagnosed her with "status post motor vehicle

accident," involving residual weakness and decreased range of motion in her left upper

extremity; asthma; and type II diabetes.  (Id.)  Dr. Seu opined that plaintiff could stand/walk for 6

hours in an 8-hour workday with hourly breaks, attributing these limitations to her "relatively

recent motor vehicle accident, with prolonged hospitalization."  (Id.)  Dr. Seu also found that

plaintiff could sit for 6 hours in an 8-hour workday; could lift and carry 20 pounds occasionally

and 10 pounds frequently with her right upper extremity only; and that she could not do much

with her left arm due to decreased range of motion, weakness, and associated manipulative

limitations.  (AT 202-03.)  Dr. Seu further opined that plaintiff did not require an assistive

device, that she had no postural limitations on bending, stooping, or crouching, but that she had

potential environmental limitations due to her asthma.  (Id.)

On December 1, 2006, state agency psychiatrist, Dr. Walk, reviewed plaintiff's

medical records and opined that plaintiff did not have a medically determinable mental

impairment.  (AT 209-19.)  Dr. Walk noted that plaintiff had a limited psychiatric consultation[9]

during her hospitalization, with an impression of anxiety disorder, "rule out history of

depression," and "rule out psychosis," but stated that plaintiff presented well at her subsequent

physical consultative examination, was able to give a detailed history and effectively cooperate

with the examination, and that the consultative examiner did not note any psychological

symptoms or indications of substance abuse.  (AT 117, 219.)

On February 8, 2007, plaintiff's treating family medicine physician, Dr. Meeta

Saxena, wrote a brief letter stating that plaintiff had been unable to work since her accident and

that she continued "to have physical and mental limitations that prevent her from returning to

work."  (AT 303.)  Subsequently, on April 17, 2008, Dr. Saxena wrote a virtually identical letter,

adding that plaintiff was "still being treated by speech therapist to improve her cognitive function

---

[9] At the time, plaintiff was intubated, could not verbally respond to questions, and the
psychiatrist noted that her thought process, cognitive function, insight, and judgment were
difficult to evaluate.  (AT 116-17.)

1   and linguistic skills."  (AT 238.)

2          Also on April 17, 2008, Dr. Saxena submitted a more detailed "Medical Report of

3   Physical and Mental Work-Related Impairments."  (AT 296-301.)  Dr. Saxena stated that she had

4   been treating plaintiff since September 2006 and diagnosed her with hypertension, diabetes

5   mellitus type 2, asthma, status post motor vehicle accident, migraine, posttraumatic stress

6   disorder, depression, and anxiety.  (AT 297.)  She indicated that plaintiff's prognosis was good

7   and that she was responding to multiple modalities of treatment, including medication, physical

8   therapy, occupational therapy, and speech therapy, but that she needed more time to recover.

9   (Id.)  Dr. Saxena opined that plaintiff could occasionally lift or carry up to 10 pounds; could

10  sit/stand/walk for one hour at a time without interruption; could sit for 3hours, stand for 2 hours,

11  and walk for 4 hours total in an 8-hour workday; could only occasionally use her left hand for

12  grasping and fine manipulation, with no restriction as to her right hand; could frequently balance

13  and kneel, occasionally stoop and crouch, and never climb or crawl; had to avoid all exposure to

14  moving machinery, dust, fumes, odors, and smoke; had to avoid even moderate exposure to

15  noise; and had to avoid concentrated exposure to vibrations.  (AT 298-300.)

16          With respect to mental status, Dr. Saxena indicated that plaintiff had a good

17  ability to relate to co-workers and maintain her personal appearance; a fair ability to follow work

18  rules, deal with the public, use judgment, interact with supervisor(s), function independently,

19  maintain attention/concentration, understand/remember/carry out complex job instructions,

20  understand/remember/carry out detailed but not complex job instructions, understand/remember/

21  carry out simple job instructions, behave in an emotionally stable manner, relate predictably in

22  social situations, and demonstrate reliability; and a poor ability to deal with work stress.  (AT

23  299, 301.)[10]  Dr. Saxena further explained that plaintiff had undergone a "major post traumatic

24

25          [10] Dr. Saxena's form provided the following definitions: "Good" was defined as "[a]bility
26  to function in this area is more than satisfactory"; "Fair" was defined as "[a]bility to function in
    this area is limited but satisfactory"; and "Poor" was defined as "[a]bility to function in this area

1  stress situation" and that she needed more time for recovery.  (AT 301.)

2         On May 7, 2008, plaintiff was discharged from speech therapy due to too many

3  late arrivals and missed appointments, apparently as a result of difficulties with transportation at

4  the time.  (AT 284.)  However, the speech therapist, Sally Bella, noted that although plaintiff still

5  experienced some cognitive challenges, plaintiff was able to perform activities of daily living

6  independently and her treatment was near to completion.  (Id.)  Ms. Bella did not recommend

7  further treatment.  (Id.)

8         Sometime in the latter half of 2008, upon Dr. Saxena's departure, Dr. Ghada

9  Abdelwahed became plaintiff's primary care provider.  (AT 380-81.)  On March 6, 2009, Dr.

10  Abdelwahed completed a questionnaire diagnosing plaintiff with hypertension (controlled),

11  diabetes mellitus 2, asthma, status-post motor vehicle accident, post traumatic stress disorder,

12  depression, and anxiety.  (AT 308.)  She indicated that plaintiff's prognosis was good and that

13  plaintiff was responding to speech therapy, physical therapy, and medications, but still needed

14  more time to recover.  (Id.)  Dr. Abdelwahed opined that plaintiff could only occasionally

15  lift/carry up to 10 pounds, based on plaintiff's complaints of severe pain when lifting that amount

16  of weight.  (AT 309.)  She further opined that plaintiff could sit for 2 hours total, stand for 4

17  hours total, and walk for 5 hours total in an 8-hour workday, purportedly based on plaintiff's

18  anxiety, short attention span, and plaintiff's reports of fatigue and inability to complete thoughts.

19  (AT 310.)  According to Dr. Abdelwahed, plaintiff could occasionally use her left hand and use

20  her right hand without restriction; never climb or crawl; occasionally stoop or crouch; and

21  frequently balance and kneel.  (AT 310-11.)  She further stated that plaintiff had environmental

22  restrictions concerning heights, moving machinery, chemicals, noise, dust, temperature extremes,

23  fumes, and vibrations.  (AT 312.)  Finally, Dr. Abdelwahed noted that plaintiff had a short

24  attention span, decreased memory, poor concentration, and experienced flashbacks when she

25  _____

26  is seriously limited but not precluded."  (AT 299.)

13

1  came in contact with "different environmental factors."  (Id.)

2           In outlining the medical evidence, the ALJ gave substantial weight to the opinions

3  of consulting examiner Dr. Seu and treating physician Dr. Saxena, and found plaintiff disabled

4  between March 17, 2006, and October 1, 2008.  (AT 30-31.)  However, in finding that plaintiff's

5  disability had ceased as of October 2, 2008, the ALJ discounted the March 6, 2009 opinion of Dr.

6  Abdelwahed, reasoning as follows:

7           I give little weight to [the findings of Dr. Abdelwahed] as their
           severity is not supported by the medical records and they are too
8           extreme.  These drastic differences may be the possible result of
           sympathy for the patient or an effort to avoid unnecessary tension
9           with the patient after a demand for supporting material by the
           patient.  I note that Dr. Abdelwahed's findings are inconsistent
10          with the claimant's apparent statement to Dr. Abdelwahed on
           October 1, 2008 denying any complaints at that time (Exhibit 7F7).

11

12  (AT 32.)  After considering the medical documentation in the record from the latter part of 2008

13  through August of 2009, the court finds that the ALJ provided clear and convincing reasons for

14  discounting Dr. Abdelwahed's opinion.

15          Treatment notes from July 24, 2008, document complaints of diarrhea, heartburn,

16  and dizziness, and plaintiff appeared somewhat restless, but she denied fatigue or malaise and

17  was noted to have a pain level of 0 out of 10.  (AT 279-80.)  On October 1, 2008, plaintiff

18  informed Dr. Abdelwahed that she had no complaints and that she just needed her pain

19  medication refilled, which plaintiff had not refilled since July 2008.  (AT 263.)  Dr. Abdelwahed

20  noted that a review of plaintiff's systems was unremarkable, her lungs were clear, she had no

21  gross motor or sensory deficits, and her hypertension was controlled.  (AT 263-64.)

22          Subsequently, on November 17, 2008, plaintiff saw Dr. Abdelwahed for diabetes-

23  related treatment and also complained of worsening low back pain, left shoulder pain, and pain

24  with ambulation, apparently due to the cold weather.  (AT 260.)  Plaintiff additionally reported

25  that although she had been doing well with the traumatic experience of her 2006 accident, she

26  had just recently started having some flashbacks, and experienced some short term memory loss

14

1  and anxiety.  (Id.)  On her physical examination, Dr. Abdelwahed observed that plaintiff was

2  obese, but had full range of motion in her upper and lower extremities, had strength of 5/5 in her

3  right upper extremity and strength of 4/5 in her left upper extremity, had no gross motor or

4  sensory deficits in her lower extremities, and her lungs were clear.  (AT 261.)  Plaintiff's

5  hypertension was controlled and she was given a flu shot and prescribed pain medication and an

6  antidepressant.  (Id.)  Plaintiff requested Dr. Abdelwahed to fill out disability paperwork, but Dr.

7  Abdelwahed indicated that she first wanted to further review plaintiff's chart, because it was only

8  plaintiff's second visit with her.  (Id.)

9         Thereafter, in the first half of 2009, plaintiff's treatment notes document primarily

10 complaints of a cough, bronchitis, and sinusitis.  (AT 317-18, 327-28, 331.)  On March 6, 2009,

11 the same date that Dr. Abdelwahed completed the above-mentioned functional assessment,

12 plaintiff's main complaint was a cough.  (AT 329.)  On physical examination, Dr. Abdelwahed

13 noted that plaintiff had full range of motion in her upper and lower extremities, no gross motor or

14 sensory deficits, and that she was alert, oriented, and in no acute distress.  (Id.)  Plaintiff's

15 hypertension was noted to be controlled, although Dr. Abdelwahed found that plaintiff's asthma

16 was not adequately controlled and adjusted her medication.  (Id.)  She also encouraged plaintiff

17 to monitor her diabetes and take her diabetes medication, which plaintiff had stopped taking

18 since January 2009.  (AT 329-30.)  Subsequently, on April 8, 2009, plaintiff continued to

19 complain of a cough, and Dr. Abdelwahed again observed that plaintiff had full range of motion

20 in her upper and lower extremities, a normal gait, no gross motor or sensory deficits, her lungs

21 were clear, and that she was alert and oriented.  (AT 325.)  Dr. Abdelwahed refilled plaintiff's

22 pain medication and advised her to stop smoking.  (AT 326.)  A pulmonary function report dated

23 May 13, 2009 indicates that plaintiff had normal spirometry, lung volume, and diffusion capacity.

24 ////

25 ////

26 ////

1    (AT 319.)[11]

2        In light of the above, the ALJ reasonably found that Dr. Abdelwahed's opinion,

3    which included severe lifting/carrying, standing/walking/sitting, and postural limitations, was

4    inconsistent with the weight of the medical records and treatment notes after October 1, 2008.

5    Dr. Abdelwahed's treatment notes do not contain "the sort of description and recommendations

6    one would expect" if plaintiff were "totally disabled under the Act."  Rollins v. Massanari, 261

7    F.3d 853, 856 (9th Cir. 2001).  As noted above, Dr. Abdelwahed generally found that plaintiff

8    had full range of motion in all extremities, a normal gait, no gross motor or sensory deficits, and

9    mostly normal strength.  On October 1, 2008, plaintiff reported no specific complaints (AT 263),

10   and the vast majority of plaintiff's subsequent complaints related to coughs and sinusitis.

11       To be sure, plaintiff continued to experience some pain and Dr. Abdelwahed

12   refilled plaintiff's pain medication.  However, the ALJ accounted for slight to moderate residual

13   pain in the post-October 1, 2008 RFC (AT 34), which appears to be supported by the mild

14   clinical findings in the treatment records and Dr. Abdelwahed's prescription of relatively

15   conservative treatment, such as medication and physical therapy.  Also, to the extent that plaintiff

16   still had some residual cognitive and psychological difficulties as a result of the March 17, 2006

17   accident after October 1, 2008, the ALJ accounted for these limitations by finding plaintiff

18   slightly limited with respect to attention/concentration, understanding/memory, and performance

19   of simple routine repetitive tasks; and finding that plaintiff should only have limited contact with

20

21       [11] Among the records submitted to the Appeals Council was a note from Dr. Raghunath
     Reddy, dated October 5, 2009, merely stating that plaintiff had chronic back and shoulder pain,
22   was very anxious and nervous, and was "not physically and mentally ready to work at this time."
     (AT 333.)  Plaintiff's handwritten notes suggest that her first visit with Dr. Reddy was on
23   September 15, 2009.  (AT 334.)  Given that the ALJ's decision was rendered on August 19,
     2009, Dr. Reddy's opinion does not appear to relate to the period under review.  Moreover, even
24   if it did, Dr. Reddy's opinion is wholly conclusory and unsupported by clinical findings, and thus
     does not constitute material evidence justifying a remand.  Mayes v. Massanari, 276 F.3d 453,
25   462 (9th Cir. 2001) (holding that to justify a remand, new evidence that was presented to the
     Appeals Council must be material); Meanel, 172 F.3d at 1114 (treating physician's conclusory,
26   minimally supported opinion rejected).

                                               16

1   the public and would require occasional supervision.  (AT 34.)[12]

2            Therefore, the court finds that the ALJ provided clear and convincing reasons for

3   discounting the opinion of Dr. Abdelwahed, and that substantial evidence in the record as a

4   whole supports the ALJ's evaluation of the medical evidence.

5            2.      Whether the ALJ improperly discounted plaintiff's testimony concerning

6                    her symptoms and functional limitations

7            In Lingenfelter v. Astrue, 504 F.3d 1028 (9th Cir. 2007), the Ninth Circuit Court

8   of Appeals summarized the ALJ's task with respect to assessing a claimant's credibility:

9            To determine whether a claimant's testimony regarding subjective
             pain or symptoms is credible, an ALJ must engage in a two-step
10           analysis.  First, the ALJ must determine whether the claimant has
             presented objective medical evidence of an underlying impairment
11           which could reasonably be expected to produce the pain or other
             symptoms alleged.  The claimant, however, need not show that her
12           impairment could reasonably be expected to cause the severity of
             the symptom she has alleged; she need only show that it could
13           reasonably have caused some degree of the symptom.  Thus, the
             ALJ may not reject subjective symptom testimony . . . simply
14           because there is no showing that the impairment can reasonably
             produce the degree of symptom alleged.
15
             Second, if the claimant meets this first test, and there is no
16           evidence of malingering, the ALJ can reject the claimant's
             testimony about the severity of her symptoms only by offering
17           specific, clear and convincing reasons for doing so. . . .

18   Lingenfelter, 504 F.3d at 1035-36 (citations and quotation marks omitted).  "At the same time,

19   the ALJ is not required to believe every allegation of disabling pain, or else disability benefits

20   would be available for the asking...."  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).

21   ////

22          _____

23          [12] Moreover, plaintiff stated that, after the initial psychiatric consultation during her
        hospitalization for the automobile accident, she was not referred for, or in need of, further mental
        health treatment.  (AT 228, 382-83.)  According to plaintiff, her anxiety was in large part
24      attributable to the bills she had to pay, and she conceded that her anxiety did not prevent her from
        performing work-related activities.  (AT 228.)  Dr. Abdelwahed's more severe opinion
25      concerning plaintiff's mental status is also inconsistent with the opinion of plaintiff's long-time
        primary health care provider, Dr. Saxena, who mostly rated plaintiff's mental abilities to be good
26      or fair.  (AT 299, 301.)

                                                17

"The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009) (quoting Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)).  In weighing a claimant's credibility, an ALJ may consider, among other things, the "[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002) (modification in original) (quoting Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)).  If the ALJ's credibility finding is supported by substantial evidence in the record, the court "may not engage in second-guessing." Id. at 959.

As an initial matter, the court notes that the ALJ did not entirely discredit plaintiff's allegations of pain, anxiety, and other symptoms.  Indeed, the ALJ specifically found that plaintiff was not symptom free at all times and restricted her to a limited range of light work, with various nuanced physical and mental limitations.  (AT 29, 34.)  Nevertheless, to the extent that the ALJ discounted plaintiff's testimony regarding her symptoms and functional limitations, the ALJ provided several specific, clear, and convincing reasons for doing so.

First, the ALJ observed that plaintiff's allegations of disabling symptoms after October 1, 2008, are inconsistent with the medical records and treatment notes for that period.  For the reasons outlined above, the court concludes that this finding is supported by substantial evidence.  "[A]fter a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005) (citing Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991)).  Lack of medical evidence is nevertheless a relevant factor for the ALJ to consider. Burch, 400 F.3d at 681. Moreover, as discussed above, some of the medical evidence after October 1, 2008, such as Dr.

Abdelwahed's clinical findings of full range of motion in all extremities, a normal gait, no gross motor or sensory deficits, and mostly normal strength (AT 261, 325, 329), actually tend to controvert plaintiff's allegations of disabling symptoms and functional limitations.

Second, as the ALJ noted, plaintiff's testimony was inconsistent with her own October 1, 2008 statement to Dr. Abdelwahed that she had no specific complaints (AT 263), as well as plaintiff's complaints that were documented in the subsequent medical records, most of which related to coughs, sinusitis, and other routine health matters.  (AT 29, 32.)

Third, the ALJ found that plaintiff's activities failed to demonstrate limitations to the degree alleged.  (AT 29.)  "While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting ... Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  Molina, 674 F.3d at 1112-13 (citations and quotation marks omitted).

Here, the ALJ noted plaintiff's testimony at the March 19, 2009 hearing that she "prepares meals twice a day, washes dishes three to four times a week, mops floors once a month, sweeps/vacuums once a week, dusts once a month, does laundry once a week, cleans the bathroom four times a month, goes shopping twice a month, makes the bed once a day, changes bedding once a week, watches television four to five hours a day, listens to the radio for 1 hour a day, socializes twice a week, and pays bills.  She further testified that she spends the rest of the day arranging paperwork and cleaning.  Finally, she testified that she goes outside for one hour a day and is able to drive a vehicle."  (AT 29, 372-79.)  The ALJ concluded that plaintiff's daily activities were not as limited as one would expect given her complaints of disabling symptoms and limitations, reasoning that plaintiff was "able to do some housework, watch television, prepare meals and drive a car."  (AT 29.)

////

1          As the ALJ referenced, the record also contains some contrary evidence, such as

2   other statements by plaintiff and plaintiff's friends and family members, suggesting that

3   plaintiff's activities are more limited.  (AT 29.)  However, it is the function of the ALJ to resolve

4   any ambiguities, and the court finds the ALJ's assessment to be reasonable and supported by

5   substantial evidence.  See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (affirming

6   ALJ's credibility determination even where the claimant's testimony was somewhat equivocal

7   about how regularly she was able to keep up with all of the activities and noting that the ALJ's

8   interpretation "may not be the only reasonable one").  As the Ninth Circuit explained:

9          It may well be that a different judge, evaluating the same evidence,
           would have found [the claimant's] allegations of disabling pain
10         credible.  But, as we reiterate in nearly every case where we are
           called upon to review a denial of benefits, we are not triers of fact.
11         Credibility determinations are the province of the ALJ...Where, as
           here, the ALJ has made specific findings justifying a decision to
12         disbelieve an allegation of excess pain, and those findings are
           supported by substantial evidence in the record, our role is not to
13         second-guess that decision.

14   Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989).

15          3.      Whether the ALJ improperly formulated hypotheticals for the vocational

16                  expert's consideration

17          Plaintiff further argues that the ALJ erred by failing to reference the hypotheticals

18   given to the vocational expert to any particular exhibit in the claimant's file or to particular

19   periods of time.  This argument lacks merit.  Indeed, plaintiff provides no authority for the

20   proposition that the ALJ must apprise the vocational expert that a hypothetical is tied to any

21   particular period of time or any particular exhibit in the record.

22          While an ALJ may pose a range of hypothetical questions to a vocational expert,

23   based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the

24   basis for the ALJ's determination, i.e., the hypothetical that is predicated on the ALJ's final RFC

25   assessment, must account for all of the limitations and restrictions of the particular claimant.

26   Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1228 (9th Cir. 2009).  "If an ALJ's

1   hypothetical does not reflect all of the claimant's limitations, then the expert's testimony has no

2   evidentiary value to support a finding that the claimant can perform jobs in the national

3   economy." Id. (citation and quotation marks omitted).  However, the ALJ "is free to accept or

4   reject restrictions in a hypothetical question that are not supported by substantial evidence."

5   Greger v. Barnhart, 464 F.3d 968, 973 (9th Cir. 2006).  Furthermore, as the Ninth Circuit has

6   observed, an ALJ may synthesize and translate assessed limitations into an RFC assessment (and

7   subsequently into a hypothetical to the vocational expert) without repeating each functional

8   limitation verbatim in the RFC assessment or hypothetical.  Stubbs-Danielson v. Astrue, 539

9   F.3d 1169, 1173-74 (9th Cir. 2008) (holding that an ALJ's RFC assessment that a claimant could

10  perform simple tasks adequately captured restrictions related to concentration, persistence, or

11  pace, because the assessment was consistent with the medical evidence).

12           In this case, because the court finds that the ALJ's RFC assessment concerning

13  the period after October 1, 2008, was supported by substantial evidence, the only issue is whether

14  the ALJ's hypothetical ultimately used for the post-October 1, 2008 period adequately captured

15  that RFC assessment.  The hearing transcript shows that plaintiff's post-October 1, 2008 RFC

16  was accurately reflected in the combination of base hypothetical 1 and hypothetical 4 (which

17  provided additional non-exertional limitations), and that the ALJ relied on the vocational expert's

18  testimony in response to these hypotheticals to find that plaintiff could return to some of her past

19  work and that there were also other jobs that existed in significant numbers in the economy that

20  plaintiff could perform.  (AT 404-05, 407-08.)[13]  Accordingly, the ALJ appropriately utilized the

21  vocational expert testimony.

22

23          [13] Although plaintiff does not raise the issue, it appears that the ALJ erred in finding that
    plaintiff could return to her past work as an office manager.  (AT 35.)  To the contrary, the
    vocational expert testified in response to hypothetical four that that occupation would be
24  precluded.  (AT 407.)  Nevertheless, this was harmless error, because the ALJ correctly found,
    based on the vocational expert's testimony, that plaintiff could return to her past work as a
25  courier and could perform alternative occupations such as office helper, mail clerk, and fast food
    worker.  (AT 35, 404-05, 407-08.)  See Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir.1990)
26  (harmless error analysis applicable in judicial review of social security cases).

1           4.    <u>Whether the ALJ erroneously determined that plaintiff had not changed</u>

2                <u>age categories during the relevant period.</u>

3           In his decision, the ALJ found that plaintiff's age category had not changed since

4    October 2, 2008.  (AT 34.)  Plaintiff points out that this finding was erroneous, because plaintiff,

5    with a birth date of March 31, 1959, turned 50 years old on March 31, 2009, prior to the August

6    19, 2009 decision, thus changing her status from that of a "younger individual" to one of "closely

7    approaching advanced age."  (AT 36, 358); <u>see</u> 20 C.F.R. §§ 404.1563, 416.963.

8           Nevertheless, the court finds that any such error was harmless.  <u>Curry</u>, 925 F.2d at

9    1129.  As an initial matter, although plaintiff turned 50 prior to the date of the ALJ's written

10   decision, plaintiff was still a "younger" individual at the time of the October 2, 2008 medical

11   improvement.  Moreover, even if the ALJ had found plaintiff to be an individual "closely

12   approaching advanced age," her age category would only have been deemed to seriously affect

13   her ability to adjust to other work if she had limited work experience.  <u>See</u> 20 C.F.R. §§

14   404.1563(d), 416.963(d).  However, in this case, plaintiff had a fairly extensive work history, and

15   the ALJ actually found that she could return to some of her past work.  Accordingly, the ALJ's

16   technical error was inconsequential to the ultimate non-disability determination.

17   V.    <u>CONCLUSION</u>

18          In sum, the court finds that the ALJ's evaluation of the medical evidence and

19   credibility determinations were supported by substantial evidence in the record as a whole, and

20   that the Commissioner produced sufficient evidence to rebut the presumption of continued

21   disability and to conclude that plaintiff's disability ceased as of October 2, 2008.  Accordingly,

22   IT IS HEREBY ORDERED that:

23          1.    Plaintiff's motion for summary judgment (Dkt. No. 16) is DENIED.

24          2.    The Commissioner's cross-motion for summary judgment (Dkt. No. 21) is

25   GRANTED.

26          3.    Judgment is entered for the Commissioner.

1        4.      The Clerk of Court is directed to close this case.

2              IT IS SO ORDERED.

3    DATED: January 30, 2013

4

5                                              _____
                                               KENDALL J. NEWMAN
6                                              UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26